## DOUBLEDAY *v.* BEATTY.

*(Circuit Court, W. D. Pennsylvania.* May 9, 1882.)

1. PATENTS FOR INVENTIONS—PRIOR USE—ANTICIPATION.

It is not sufficient to raise a doubt as to the novelty of the plaintiff's patent. It must be affirmatively proved to be old by preponderating and satisfactory proof; but where the evidence is fully up to the standard, especially in view of the long and unexplained acquiescence of the patentee and his assignee in the general and notorious use of the patented device, and that for a period of 12 years it had been habitually infringed, without objection on their part, in the absence of any rational explanation, and where a number of witnesses unimpeached testified to its prior use, the defence of anticipation is established.

2. SAME—CONNECTION BETWEEN PARTS OF DEVICE.
    Where an element in the combination is not mentioned in the patent, and
    only incidentally referred to in the body of the specification, it is insufficient
    to show a connection between the various parts of the device.

In Equity.

*George H. Christy*, for complainant.

*James C. Boyce*, for respondent.

ACHESON, D. J. This suit, instituted August 30, 1877, is brought for the infringement of letters patent No. 47,133, granted to John B. Root, April 4, 1865, for an "improvement in oil-well pumps." The patent was assigned by Root to James L. Jackson, who, on March 6, 1877, granted to the plaintiff, H. H. Doubleday, the exclusive right thereunder for the township of Deerfield, Warren county, Pennsylvania, within which territory the infringement complained of was committed.

The gases which accumulate in petroleum wells were found at an early day to interfere with the pumping of the oil. Originally, the wells were tubed with a single tube, and the then mode was to place a seed-bag—*i. e:*, a leather bag filled with flaxseed—around the outside of the tube above the oil-bearing rock to serve as a packing between the tubing and walls of the well, to exclude the water above from the lower part of the bore, where the oil is obtained. But this arrangement left no other outlet for the gases save through the valves of the oil pump, and the upward pressure prevented the valves from closing properly. It clearly appears, however, and, indeed, is not denied, that prior to Root's alleged invention two concentric tubes had been employed in oil wells,—the inner one being the pumping tube, and the seed-bag being placed around the outside of the outer tube, called the "casing." Thus provision was made for removing the oil tube and oil pump without disturbing the seed-bag, while the annular space between the two tubes formed a passage from the bottom to the top of the well through which the gases might escape. Indisputably, this improvement was anterior to Root's alleged invention, although his specification throughout implies the contrary. It was embodied in Shoup's patent of December 27, 1864. But casing in oil wells was older even than Shoup's invention, which was as early as April 26, 1862.

The following is an extract from Root's specification:

"The object of this invention is to obviate this interference of the gases with the working of the oil pumps, and to this end it consists in providing in an oil well, besides the ordinary oil tube connected with the oil pumps, an

additional tube connected with an exhausting pump at the top of the well for drawing off or permitting the escape of gases. It also consists in a certain mode, hereinafter described, of applying such additional tube and the seed-bag in combination with each other and with the oil tube, whereby great facility is afforded for applying the said additional tube, and for the removal of the oil tube and oil pump from the well without disturbing the seed-bag or permitting water to enter the lower part of the well."

"C" is the additional tube, and the specification says:

"This tube, C, surrounds the oil tube, and is attached to the upper end thereof by an air-tight flanged joint, *b.*"

The specification contains no further allusion to this flanged joint except in the following clause, viz.:

"It is not absolutely necessary to arrange the gas tube, C, around the oil tube, as it might be arranged on one side thereof if the seed-bag be properly applied in connection with the two tubes to exclude water from the lower part of the well; but I consider it best to arrange it around the oil tube, as represented, as so applied it enables the oil tube and pump to be taken up, whenever necessary, by disconnecting the flange, *b,* without disturbing the seed-bag."

The patent has two claims, the first of which is as follows:

"(1) The employment in an oil well of an additional tube, so arranged and applied, in combination with the oil tube and an exhausting pump, that, while it permits the exclusion of water from the lower part of the well by means of the seed-bag, it provides for the escape of the gases from the well, substantially as herein described."

As respects this claim the defence insisted on is that Root was not the original inventor, and a great deal of testimony has been taken to show prior use at various oil wells in the oil regions of Pennsylvania. His patent, as we have seen, was granted April 4, 1865, upon an application filed November 8, 1864. Root testifies he conceived the invention some time in the summer of 1864, but the exact date he does not know. His specification was sworn to October 24, 1864, which is the earliest fixed date we have for the completed invention.

Ten witnesses were examined on the part of the defendant to prove prior use of said combination at the Jennings & Grandin well on Tidioute flats, Deerfield township, Warren county, Pennsylvania. The evidence certainly shows that at that well an additional tube was put down outside of the oil tube and through the seed-bag, which latter was so arranged around the two tubes as to exclude the water from the lower part of the well; and that this additional tube was connected at the top of the well with a gas pump which was worked by the walking-beam which pumped the oil. The combination was

the same as that covered by Root's first claim, and was successfully used at that well for several months, at least, for the same purpose contemplated by Root; and, if such use was prior to his invention, it completely anticipated his first claim. These witnesses all testify to the use of the combination at the Jennings & Grandin well, in the year 1863. We have no reason to doubt the honesty of these witnesses, and the only remaining question, therefore, is whether they are correct in their recollection as to time.

Chambers Green testifies positively that he leased that well in the winter of 1862–3. He commenced to operate it, he thinks, in January. Originally, he says, he had no partner with him. In the spring or summer of 1863 he sold out to Allen and another man, who ran it about one month, at the end of which time he (Green) bought back an interest, and then he and Allen ran the well until May, 1864. He testifies he first applied the gas pump to the well in the spring of 1863, when he was running it himself; that he took the gas pump away when he sold out, but when he bought back an interest he brought the gas pump back, and again put it on the well, and that thereafter it was used while he and Allen had the well. He further states that in the summer of 1864 he went to the McClintock farm, on Oil creek, and there drilled a well; that he was taken sick in November, 1864, and was sick pretty much all that winter, and that he came back to Tidioute in the spring of 1865. These latter circumstances, about which the witness can scarcely be mistaken, tend to corroborate him as to the time when he operated the Jennings & Grandin well.

Charles A. Allen, Green's partner, had been a soldier in the Union army, and he testifies that he came home on a furlough in the spring of 1863; that he remained at home about one year, returning to the army in February, 1864, but not to active service; that he went into the hospital at Columbus, Ohio, stayed there about one month, was discharged March 4, 1864, and came directly home. He testifies that during the year he was home on furlough he operated the Jennings & Grandin well, in connection with Green. He describes minutely the arrangement for freeing the well of gases by means of the additional tube and gas pump. He thinks the pump was put in operation in September, 1863, and says when he came back after his discharge on March 4, 1864, "the gas pump arrangement was still there." This, he states, was the only well in which he was ever interested pecuniarily. He and Green stopped working it, he thinks, in May, 1864. Afterwards, during that summer, for about two or three

months, he was employed, he says, on the "salt" well, and about October 1, 1864, went to Michigan, where he remained three months. It is inconceivable that Allen can be mistaken in respect to his dates connected with his army life. He is an unimpeached witness, and as to the time when the gas pump was used at the Jennings & Grandin well he is corroborated by no less than eight witnesses, exclusive of Green, viz., L. H. Sprague, James C. Bowen, J. T. Thorpe, Alexander Gill, Charles S. Garrett, Henry Bowman, James B. Jennings, and N. Carbaugh.

Several of these witnesses fix the time in a reasonably satisfactory way by reference to events about which they are not likely to be mistaken. Thus, Sprague was married in September, 1862. His father-in-law came to live with him the next spring. The two ran the Culbertson, Jackson & Waters well from the spring of 1863 until the spring of 1864. That spring (1864) Sprague hired as foreman to the Tipton Oil Company. A receipt produced, dated September 25, 1863, fixes that as the year he was engaged at the Culbertson, Jackson & Waters well. He testifies that while he was operating that well with his father-in-law he bought some wood from the Economy Oil Company, and immediately sold it to Green & Allen, who were then running the Jennings & Grandin well; that he went to that well to collect the money for the wood, and saw a gas pump there in operation, and carefully examined it. He fixes September, 1863, as the date of the transaction about the wood, and his visit to the Jennings & Grandin well, and says the wood he sold Green & Allen "is all I ever sold them, or anybody else, that year, or any other year." Bowen testifies he went to Fredonia, New York, about May, 1862, and resided there about two years; that on the occasion of a visit from New York state to Tidioute he saw a gas pump used at the Jennings & Grandin well. He fixes the fall of 1863 as the time, and says "Charles Allen and Chambers Green were at work on it." Thorpe went to work at the Wright well, near the Jennings & Grandin well, on September 26, 1863,—a date he obtains from an old memorandum book he produces. He says they then had "a pump for pumping gas from that well," (Jennings & Grandin's.) "The pump was stationed in the derrick. I was a green hand and new to the business, and I noticed it as being different from the well I was working on." He adds that he "sometimes relieved Mr. Allen for an hour or so when he wanted to leave the well, and ran the Jennings & Grandin well for him."

To convict the witnesses of mistake in point of time, the plaintiff's counsel made a vigorous argument based upon the assumption that

Carbaugh swears he held the lease of the Jennings & Grandin well prior to the time when Green & Allen took it, and that he sold the lease to them in October, 1863. But the evidence by no means warrants such assumption. The testimony of Carbaugh as to his interest is as follows, (Plaintiff's Record, pages 349 and 350:)

114 X Q. "What did you go to work at when you left that Shaw well?"
A. "I think I went to work on the Jennings & Grandin wells."
115 X Q. "What doing?"
A. "Rigging it up for pumping."
116 X Q. "At what salary per day?"
A. "One-fourth of the production of the well."
117 X Q. "How long did you work on those wells?"
A. "But a short time. I sold my interest to Chambers Green and Charles Allen."

This is all the witness said in respect to any interest he had in the Jennings & Grandin well, although in some subsequent cross-interrogatories the examining counsel assumed he had gone much further. But by no fair construction of his testimony can the assumption be sustained. The uncontradicted evidence is that James B. Jennings leased the Jennings & Grandin well to Green.

We adhere to the rule "that it is not sufficient to raise a doubt as to the novelty of the plaintiff's patent; it must be affirmatively proved to be old by preponderating and satisfactory proof." *Tomkins* v. *Gage*, 2 Fisher, 577. But in this instance we think the evidence of prior use is fully up to this standard, especially in view of the long and unexplained acquiescence of Root, the patentee, and his assignee, Jackson, in the general and notorious use of the patented devices. Immediately after the issue of the patent, Jackson, to whom a half interest was then assigned, built two exhausting engines and pumps, took them to the oil regions and put them in operation, and sold them on July 26, 1865, to the Atlantic & Great Western Petroleum Company. From that date down to March 6, 1877, when the assignment to the plaintiff was made, neither Root nor Jackson, so far as appears, took any step in assertion of their rights under the patent. Yet as early as 1867 gas pumps such as are now employed had come into extensive use at oil wells, and various patents thereon were soon taken out. It is in evidence that since 1867 the wells in the oil regions, with hardly an exception, have employed substantially the arrangement of casing, pumping tube, and casing head in use at the defendant's wells. One witness states that in the ten years prior to the date of this examination (July 17, 1879) not less than 30,000 oil

wells were sunk in the oil regions. Here, then, was a patent of great value, if valid, openly and habitually infringed, without objection on the part of the patentee or his assignee. Why was this? In the absence of any other rational explanation, does not the conduct of Root and Jackson justly excite the suspicion that they were conscious that the patent was invalid by reason of prior use? At any rate, a plaintiff who, after an acquiescence for the period of 12 years in the almost universal use of a patented invention, buys into the patent and essays to enforce it against the public, ought not to be surprised to find the courts inclined to believe a multitude of respectable witnesses who testify to prior use, even should the witnesses speak largely from memory. The present defence, however, does not rest upon the unsupported recollection of the witnesses. Their accuracy in respect to time is sufficiently verified by contemporary circumstances; and upon the whole we are entirely satisfied that the defence of anticipation of the first claim of the patent is established by the proofs.

We come now to the consideration of the second claim, which is as follows:

"(2) The arrangement of the tube, C, surrounding and connected with the upper part of the oil tube, A, and applied within the well, substantially as herein described, whereby the oil tube and oil pump may be removed without disturbing the seed-bag."

The first question here arising is one of construction. It is contended upon the part of the plaintiff that the claim embraces as one of its elements a removable air-tight casing head, which covers and closes at the top the annular space between the inner or pumping tube and the exterior tube or casing. If this was intended, the claim is very unfortunate in its phraseology. The air-tight flanged joint, $b$, which is now claimed to be the principal element in the combination, is not mentioned at all in the claim of the patent, and in the body of the specification is only referred to incidentally. The specification states two objects as contemplated by the invention. The first is to obviate the interference of the gases with the working of the oil pumps, and to this the first claim is referable. The other specified object is to facilitate the removal of the oil tube and oil pump from the well without disturbing the seed-bag, and to this the second claim is referable. But how does a connection of the two tubes at the top by means of a tight joint contribute to the result contemplated by the second claim? So far from facilitating the removal of the oil tube and oil pump it is a positive hindrance thereto.

The only words in the claim which give the slightest color to the construction upon which the plaintiff insists, are "and *connected with.*" But in what sense connected? The specification explains that "the length of the said tube, C, is such that it extends from the upper end of the oil tube to such depth down the bore, *a, a,* of the well as it is desirable to place the seed-bag." Now, although the words "and connected with" are ill-chosen, we think they must be held to refer merely to the *relation* which the two tubes bear to each other in securing the desired end. "The *arrangement* of the tube, C, surrounding and connected with the upper part of the oil tube, A, and *applied within the well,* substantially as herein described, whereby," etc. Who, upon the first reading of the claim, would understand it to include an air-tight separable connection between the tube, C, and the oil tube? If this was what Root meant he should have expressed himself in at least reasonably intelligible terms. We are of opinion that the claim will not bear the construction for which the plaintiff contends.

If the air-tight separable connection between the top of the casing tube, C, and the oil tube, A, forms no part of the combination claimed, then confessedly there was no novelty in the second claim. Much testimony has been taken to show that, even upon the plaintiff's construction of the claim, it had been anticipated by the prior use at a number of oil wells of a separable casing head. But it is not necessary to consider this branch of the defence in our view of the scope of the second claim. Let a decree be drawn dismissing the bill, with costs.

McKENNAN, C. J. This case was argued before both the judges of the circuit court, and was considered with a disposition to sustain the patent if the proofs would at all allow it. The evidence touching the anticipation of the first claim is unusually full and satisfactory, and is, in my judgment, clearly decisive against its validity.

Notwithstanding the very ingenious and impressive argument of the complainant's counsel, the impression which was made upon my mind at the hearing, as to the true meaning and construction of the second claim, is not only unshaken, but has been confirmed by subsequent reflection. That claim is correctly expounded in the opinion of Judge ACHESON.

I therefore concur unreservedly in his opinion.